UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. **00 - 6122** CR-ZLOCH

18 USC 371
18 USC 1010
18 USC 1014
18 USC 1341
18 USC 1343
18 USC 1344
18 USC 1957

**CR - ZLOCH**

UNITED STATES OF AMERICA,

    **Plaintiff,**

v.

JOHN "JACK" KUDRON

    **Defendant.**



## INFORMATION

The United States Attorney charges that:

### COUNT I

### CONSPIRACY TO COMMIT BANK FRAUD, MAIL FRAUD, WIRE FRAUD, HUD FRAUD, AND MONEY LAUNDERING

1. From in or about 1993, and continuing until in or about December 1996, the exact dates being unknown, in Broward County, in the Southern District of Florida, and elsewhere, the defendant,

JOHN "JACK" KUDRON

did knowingly and willfully combine, conspire, confederate, and agree with persons known and unknown to commit the following offenses against the United States:



    (a)    bank fraud, in violation of Title 18, United States Code, Section 1344;

    (b)    defrauding the Department of Housing and Urban Development ("HUD"), in violation of 18 United States Code, Section 1010;

    (c)    filing false loan applications with financial institutions, in violation of Title 18 United States Code, Section 1014;

    (d)    mail fraud, in violation of Title 18, United States Code, Section 1341;

    (e)    wire fraud, in violation of Title 18, United States Code, Section 1343; and

    (f)    money laundering, in violation of Title 18, United States Code, Section 1957.

## BACKGROUND

At all times material to this information:

2.    SunBank/ South Florida N.A., (now known as SunTrust Bank), Barnett Bank (now known as Bank of America) and Savings of America (now known as Washington Mutual) (hereinafter the "the Banks") are nationally chartered banks whose deposits are insured by the Federal Deposit Insurance Corporation.

3.    First Bankers Mortgage Services, Mortgage Dynamics, National Mortgage, Bennett Financial, Preferred Funding, CFI Mortgage Corporation and Advantage Financial are mortgage brokers (hereafter referred to as the Mortgage Brokers). The Mortgage Brokers are in the business of finding lenders for persons who need a loan to purchase real estate. During the course of funding a loan for the buyer, the Mortgage Brokers would send documents and other items to the lender and receive documents and other items from the lender, including funds for closing, by facsimile, wire transfer, and by commercial interstate carrier.

4.    The Department of Housing and Urban Development (HUD) is an agency of the United States government whose duties include guaranteeing loans to low income home buyers in

order to enable them to buy homes, and selling foreclosure properties to individuals who intend to live in the property as an owner-occupant.

### Object of the Conspiracy

5. It was the object of the conspiracy for the defendant and his coconspirators to unlawfully profit through the sale of real property by submitting and causing to be submitted false information and false documentation to the Banks, the Mortgage Brokers, and HUD in order to purchase low income property and to induce the Banks and Mortgage Brokers to make loans totaling in excess of $15,000,000 to in excess of 150 people who could not otherwise qualify for a loan

### Manner and Means of the Conspiracy

6. It was part of the conspiracy that defendant and his coconspirators would and did obtain and finance the purchase of residential real estate, which real estate included purchases of foreclosures from HUD.

7. It was further part of the conspiracy that the defendant solicited or caused to be solicited "straw buyers" to purchase HUD foreclosures, because for the first twenty-one (21) days after HUD homes are offered on the market the homes are only offered to owner-occupants, that is, persons who agree to live in the property as their primary residence.

8. It was further part of the conspiracy that the defendant and his coconspirators would and did pay the "straw buyers" money, generally from $200 to $500, in order for the "straw buyers" to pose as the purchaser of the HUD home.

9. It was further part of the conspiracy that the defendant would and did conspire with real estate brokers to submit bids to HUD on his behalf claiming that the "straw buyers" would be the owner-occupants of the home.

10. It was further part of the conspiracy that immediately after the real estate closing wherein the "straw buyers" had purchased the HUD home and after the closing agent for HUD had left, the defendant and his coconspirators would and did cause the "straw buyers" to sign a quit claim deed transferring the HUD home to the defendant or one of his corporations.

11. It was further part of the conspiracy that, even before the closing on the purchase of the HUD home by the "straw buyers," the defendant and his coconspirators, through their corporations, would and did execute contracts selling the property to third parties.

12. It was further part of the conspiracy that after the homes were purchased by the defendant and his coconspirators through HUD, they would spend some money improving the homes, and then sell the homes for approximately double the price to unsophisticated buyers.

13. It was further part of the conspiracy that the buyers would not have sufficient income or assets or would have too many liabilities to qualify for a loan and to pay the down payment and closing costs to purchase the property.

14. It was further part of the conspiracy that the defendant and his coconspirators would and did complete or caused to be completed a loan application for each of the buyers at the Banks and Mortgage Brokers, which loan application contained false information.

15. It was further part of the conspiracy that the defendant would and did submit or caused to be submitted with the loan application to the Banks and Mortgage Brokers false documents in order to qualify the buyer for a loan.

16. It was further part of the conspiracy that, if the income of a buyer was insufficient to qualify for a loan, the defendant would and did prepare or caused to be prepared false W-2's and pay stubs which were then submitted to the Banks and Mortgage Brokers on behalf of the buyer.

17. It was further part of the conspiracy that the defendant would create or caused to be created phony paychecks which purported to be issued by the employer for the buyer and which were then submitted to the Banks and Mortgage Brokers on behalf of the buyer.

18. It was further part of the conspiracy that the defendant would deposit or caused to be deposited into the bank account of the buyer, cash or checks in the amount of the phony paychecks issued and would provide bank statements showing those deposits to the Banks and Mortgage Brokers in order to make the Banks and Mortgage Brokers believe that the buyer was earning the income set forth in the phony paychecks.

19. It was further part of the conspiracy that, if the income of a buyer was insufficient to qualify for a loan, the defendant caused to be prepared Form 1040's which falsely stated the annual income of the buyer and which were submitted to the Banks and Mortgage Brokers on behalf of the buyer.

20. It was further part of the conspiracy that, if the assets of a buyer were insufficient to reflect the ability to make a down payment on a loan, then the defendant would and did create or caused to be created a "gift letter," which falsely represented that the down payment had been gifted

to the buyer by a relative, and would then submit the fraudulent "gift letter" to the Banks and Mortgage Brokers on behalf of the buyer.

21. It was further part of the conspiracy that the defendant would and did create bank statements or alter existing bank statements which would show balances for the buyer or a person gifting the down payment to the buyer, either greatly over-representing the true balance in the account or a substantial balance in a bank where the person had no account, and would then submit the fraudulent bank statements to the Banks and Mortgage Brokers.

22. It was further part of the conspiracy that the defendant and his coconspirators would and did issue checks to the buyers, which checks were cashed and deposited into the buyer's bank account in order to make it appear to the Banks and Mortgage Brokers as if the buyer had sufficient funds to pay the down payment and the closing costs on the purchase of the house.

23. It was further part of the conspiracy that the defendant and his coconspirators would and did negotiate a down payment from the buyer that was less than the Banks and the Mortgage Brokers would accept, and then would deceive the Banks and Mortgage Brokers by having the buyer issue them checks in the amount of the required down payment which was submitted to the Banks and Mortgage Brokers and would then reimburse the buyers for those checks in full or in part.

24. It was further part of the conspiracy that, if the buyer had little or no credit history, the defendant would and did create or caused to be created credit reference letters from Bell South, Florida Power and Light and other businesses falsely stating the buyer had an excellent credit history, and would then submit or caused to be submitted the credit reference letters to the Banks and Mortgage Brokers on behalf of the buyer.

25. It was further part of the conspiracy that the defendant would and did submit or caused to be submitted to the Banks and Mortgage Brokers fraudulent letters created to fill in the gaps in employment and other questions the Banks and Mortgage Brokers may have on the loan application.

26. It was further part of the conspiracy that in order to prevent the Banks and Mortgage Brokers from uncovering the false information, such as the false Form W-2's, false bank statements, and false rental information, the defendant would and did include names, telephone numbers and addresses in the loan applications submitted to the Banks and Mortgage Brokers of persons who would, at the direction of the defendant and his coconspirators, provide false verifications as to the employment, bank deposits or rental information of the buyers to the Banks and Mortgage Brokers.

27. It was further part of the conspiracy that the defendant would and did conspire with loan officers and loan processors in order that the written verification of employment forms and verification of deposit forms would be given directly to the defendant or his coconspirators instead of being mailed directly to the employers or the banks, which forms would then be falsely completed and sent back to the Banks and Mortgage Brokers.

28. It was further part of the conspiracy that the defendant would and did falsely represent to the Banks and the Mortgage Brokers that the closing costs came from the buyer when as he well knew the closing costs were paid or caused to be paid by the defendant.

29. It was further part of the conspiracy that the defendant and his coconspirators would and did pay some of the buyers up to $5,000 after the closing for purchasing the properties.

30. It was further part of the conspiracy that between 1993 and December 1996, the defendant and his coconspirators did submit or caused to be submitted to the Banks and the Mortgage Brokers false information with respect to more than 150 loans totaling in excess of $15,000,000.

31. It was further part of the conspiracy that the defendant would and did engage in monetary transactions in criminally derived property having a value greater than $10,000 by negotiating checks received at closing on fraudulently obtained loans funded by the Banks and Mortgage Brokers.

32. In furtherance of the conspiracy and to effect the objects thereof, at least one of the following overt acts, among others, was carried out by at least one co-conspirator in the Southern District of Florida, and elsewhere:

    A. On or about March 4, 1994, defendant caused to be submitted a loan application to SunBank. The loan application falsely reflected that Edgar Felix was employed by Southern Cleaning Services.

    B. In or about March 1994, defendant caused to be submitted to SunBank fraudulent federal income tax returns prepared by a coconspirator which stated that Edgar Felix earned $27,955 from Southern Cleaning Services for 1993 and $26,743 for 1992.

    C. In or about May 1995, defendant caused to be submitted a loan application to Barnett Bank. The loan application falsely reflected that Belinda Scott was employed by Mr. B's Construction.

    D. On or about June 8, 1995, defendant caused to be paid a check in the amount of $5,000 to Jonathan Scott for purchasing a property.

E. On or about July 27, 1995, defendant caused to be submitted a loan application to Savings of America. The loan application falsely reflected that Marie Jean had $14,000 in account #3871275286 at NationsBank.

F. On or about May 19, 1995, defendant caused to be submitted a loan application to First Bankers Mortgage Services. The loan application falsely reflected that Jerome Walker was employed during 1993 and 1994 at P.D.E. Security, and included fraudulent Form W-2's reflecting that Jerome Walker earned income from P.D.E. Security for 1994 of $13,120 and for 1993 of $12,840.

G. On or about May 19, 1995, defendant caused First Bankers Mortgage Services to send a facsimile to Pacific Southwest Bank, F.S.B., requesting delegated underwriting funds for a loan for Jerome Walker.

H. On or about April 2, 1996, defendant submitted a loan application to National Mortgage. The loan application falsely reflected that Minnie Harvard was employed by VC Electronics.

I. On or about May 3, 1996, defendant caused the closing agent to send a facsimile to Citicorp Mortgage Corporation in Missouri containing instructions on where to wire the funds for the loan for Minnie Harvard.

J. On or about April 3, 1996, defendant caused a loan application to be submitted to CFI Mortgage Corporation. The loan application falsely reflected that Cassandra Crawford had $5,000.00 in account #3090741891223 at First Union Bank, and that Cassandra Crawford

had made federal estimated tax payments of $9,200 in 1995 and $7,800 in 1994 based on self employment income in excess of $25,000 each year.

K. On or about April 18, 1996, defendant caused a fraudulent verification of deposit purporting to be from First Union Bank to be sent by facsimile to CFI Mortgage Corporation claiming that Cassandra Crawford had $5,327.17 in her account at First Union Bank.

L. On or about April 23, 1996, defendant caused a cashier's check in the amount of $80,838.83 to be sent by commercial interstate carrier from First State Bank-Calvert Branch, Calvert, Texas.

All in violation of Title 18, United States Code, Section 371.

_____
THOMAS E. SCOTT
UNITED STATES ATTORNEY

_____
JEFFREY N. KAPLAN
ASSISTANT UNITED STATES ATTORNEY

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA

v.
JOHN "JACK" KUDRON

CASE NO. _____

**CERTIFICATE OF TRIAL ATTORNEY***
**Superseding Case Information:**

**Court Division:** (Select One)

New Defendant(s)     Yes ____     No ____
Number of New Defendants ____
Total number of counts ____

____ Miami   ____ Key West
_X_ FTL      ____ WPB   ____ FTP

I do hereby certify that:

1. I have carefully considered the allegations of the indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.

2. I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, Title 28 U.S.C. Section 3161.

3. Interpreter:        (Yes or No) __No__
   List language and/or dialect   __English__

4. This case will take __0__ days for the parties to try.

5. Please check appropriate category and type of offense listed below:
   (Check only one)                      (Check only one)

   I     0 to 5 days       _X_      Petty      ____
   II    6 to 10 days      ____     Minor      ____
   III   11 to 20 days     ____     Misdem.    ____
   IV    21 to 60 days     ____     Felony     _X_
   V     61 days and over  ____

6. Has this case been previously filed in this District Court? (Yes or No) __No__
   If yes:
   Judge: _____    Case No. _____
   (Attach copy of dispositive order)

   Has a complaint been filed in this matter? (Yes or No) __No__
   If yes:
   Magistrate Case No. _____
   Related Miscellaneous numbers: 99-4657-SNOW; 97-4601-SNOW; and 97-4609-SNOW
   Defendant(s) in federal custody as of _____
   Defendant(s) in state custody as of _____
   Rule 20 from the _____    District of _____

   Is this a potential death penalty case? (Yes or No) __NO__

7. Does this case originate from a matter pending in the U.S. Attorney's Office prior to April 1, 1999? _X_ Yes __ No   If yes, was it pending in the Central Region? _X_ Yes __ No

_____
JEFFREY N. KAPLAN
ASSISTANT UNITED STATES ATTORNEY
Court Bar No. A5500030

*Penalty Sheet(s) attached                                           REV 4/7/99
N:\udd\hpantaie\kaplan\KUDRON\INDPKG2.wpd

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
**PENALTY SHEET**

Defendant's Name: ____JOHN "JACK" KUDRON_____    No.:_____

Count #I:

Conspiracy to commit bank fraud, to defraud the Department of Housing & Urban Development, to file false loan applications with financial institutions; mail fraud, wire fraud & money laundering, all in violation of 18:371

*Max Penalty:   5 years' maximum imprisonment, $250,000 fine

Count #:

*Max Penalty:

Count # :

*Max Penalty:

Count # :

*Max Penalty:

Count # :

*Max Penalty:

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms or forfeitures that may be applicable.**

REV 12-12-96